1  **FORTIS LLP**                          Scot Wilson
2  Matthew A. Berliner (SBN 224384)        California State Bar No. 223367
   650 Town Center Drive Suite 1530        **ROBINSON CALGANIE, INC.**
3  Costa Mesa, CA 92626                    19 Corporate Plaza Drive
   Telephone: 714-839-3800                 Newport Beach, CA 92660
4  Facsimile: 714-795-2995                 949.720.1288
   mberliner@fortislaw.com                 949.720.1292 – Facsimile
5                                          swilson@robinsonfirm.com

6  Walt D. Roper                           Robert A. Skipworth
   Texas State Bar No. 00786208            Texas State Bar No. 18473000
7  **The Roper Firm, P.C.**                **Robert A. Skipworth, Attorney at**
   3131 McKinney Avenue                    **Law**
8  Suite 600                               310 N. Mesa, Suite 600
   Dallas, TX 75204                        El Paso, TX 79901
9  214.420.4520                            915.533.0096
   1+214.856.8480 – Facsimile              915.544.5348 – Facsimile
10 walt@roperfirm.com                      rskipworth@aol.com
   *(application of pro hac vice admission*  *(application of pro hac vice admission*
11 *will be filed within ten days)*        *will be filed within ten days)*

12

13               **UNITED STATES DISTRICT COURT**

14            **NORTHERN DISTRICT OF CALIFORNIA**

15 JOHN SILVERMAN and J. EDWARDS    )   **CASE NO.:**
   JEWELRY DISTRIBUTING, LLC, as    )
16 representatives of all similarly situated )
   persons,                         )   **CLASS ACTION COMPLAINT**
17                                   )
              Plaintiffs,            )
18                                   )
        vs.                          )   **DEMAND FOR JURY TRIAL**
19                                   )
   WELLS FARGO & COMPANY;           )
20 WELLS FARGO BANK, NATIONAL       )
   ASSOCIATION; and DOES 1 – 10,    )
21 inclusive,                       )
                                     )
22           Defendants.            )
   _____  )

23

24       Plaintiffs John Silverman and J. Edwards Jewelry Distributing, LLC, file this

25 Original Class Action Complaint. Plaintiffs institute this action in accordance with,

26 and to remedy violations by, Defendants Wells Fargo & Company and Wells Fargo

27 Bank, National Association (hereinafter collectively referred to as "Wells Fargo" or

28

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

"Defendants") of the Truth in Lending Act, 15 U.S.C.A. §1601, *et seq*. (hereinafter "TILA") and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.  Plaintiffs bring this action individually and on behalf of all other persons similarly situated (hereinafter "Class Members") to recover damages and to enjoin Defendants' unlawful conduct.

## I.    INTRODUCTION

This case arises out of Wells Fargo's manipulation of merchants and consumers.  In violation of the Truth in Lending Act, Wells Fargo has created and maintains a credit card program through which it actively encourages retailers to build the "fees" that these merchants must pay Wells Fargo into the regular price of goods and services, while representing to retail consumers that the goods and services that they purchase are being financed at zero percent interest.  It represents to merchants such as Plaintiffs that its scheme is thoroughly vetted and perfectly legal, and that these fees are not finance charges.  In reality, Wells Fargo's financing scheme results in the creation of illegal hidden finance charges, and the imposition of double-digit interest rates on consumers.  As a consequence of its scheme, Wells Fargo improperly collects and retains monies charged to retail consumers as sales tax – which taxes should not be charged on finance charges – and withholds these monies from merchants.

## II.    PARTIES

Plaintiff John Silverman is a natural person who resides in El Paso, Texas.

Plaintiff J. Edwards Jewelry Distributing, LLC is a Nevada Limited Liability Corporation with its principal place of business in El Paso, Texas. Plaintiff John Silverman is the President and Manager of Plaintiff J. Edwards Jewelry Distributing, LLC.

Defendant Wells Fargo & Company is a Delaware corporation with its principal place of business in San Francisco, California. Wells Fargo & Company is a financial services company with $1.5 trillion in assets, and provides banking, insurance, investments, mortgage, and consumer and commercial finance through more than 8,300 locations, 15,300 ATMs, and the Internet. It has approximately 263,000 full-time employees and is ranked 25th on Fortune Magazine's 2017 rankings of America's 500 largest corporations. Wells Fargo & Company operates the fourth largest bank in the United States, and is the largest bank headquartered in California. Wells Fargo & Company currently has in excess of 23 million cardholders, which represents approximately 4.15% of the retail credit card market. Wells Fargo & Company is a "creditor" as defined by the Truth in Lending Act, 15 U.S.C. § 1602(g), and its implementing regulations 12 C.F.R. §226.2 (17).

Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States. Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Company, and provides most of the banking products and services that are the subject of this action. Wells Fargo Bank, N.A's headquarters and principal place of business is at 420 Montgomery Street, San

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

Francisco, California 94104.  Wells Fargo Bank, N.A. is a "creditor" as defined by the Truth in Lending Act, 15 U.S.C. § 1602(g), and its implementing regulations 12 C.F.R. §226.2 (17).

Each Defendant is a "person" within the meaning of California Business and Professions Code §17201.

All conditions precedent to the Named Plaintiffs proceeding with this lawsuit have occurred.

## III.    JURISDICTION AND VENUE

This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Named Plaintiffs are residents of Texas and Nevada and Defendants are citizens of Delaware, California, and South Dakota; there are 100 or more class members, many of whom are citizens of states other than those where Defendants are citizens; and the aggregate amount in controversy will exceed $5,000,000, exclusive of interest and costs.

Pursuant to 28 U.S.C.A. § 1367, Plaintiff and Class Members invoke the supplemental jurisdiction of this Court to hear and decide claims against the Defendants arising under state law.

Venue in this District is appropriate under 28 U.S.C.A. §§ 1391 (b) and (c) and 1441(a) because: (i) Defendants are actively doing business in this State and are subject to personal jurisdiction throughout the State; (ii) Defendants transact business in the State and in the District by and through the operation of retail banks

in this State and District; and (iii) a substantial part of the acts, transactions, events and/or omissions giving rise to the claims occurred in this District.

## IV.    THE TRUTH IN LENDING ACT ("TILA") 15 U.S.C. §§1601-1666j

In 1968, Congress enacted the Truth in Lending Act, 15 U.S.C. §§1601-1666j (TILA), in response to a growing number of consumer complaints regarding certain lending practices. Congress specifically stated that the TILA is intended so ensure "the informed use of credit" by consumers. 15 U.S.C. § 1601(a). "The informed use of credit," Congress decreed, "results from an awareness of the cost thereof by consumers." Thus, "It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *Id.* In order to achieve this broad purpose, the TILA regulates, among other things, the advertising of credit cards and the specific disclosures that must accompany offers of credit to consumers. More specifically, the TILA requires that any "finance charge" that the consumer will bear under the credit transaction be disclosed clearly and accurately. *See* 15 U.S.C. §1683(a)(3).

As the United States Supreme Court has observed, the possibility of hidden finance charges was one of Congress's chief concerns when drafting the TILA:

> One means of circumventing the objectives of the Truth in Lending Act, as passed by Congress, was that of 'burying' the cost of credit in the price of goods sold. Thus in many credit transactions in which

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA  92626
TEL 714-839-3800 • FAX 714-795-2995

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

creditors claimed that no finance charge had been imposed, the creditor merely assumed the cost of extending credit as an expense of doing business, to be recouped as part of the price charged in the transaction. Congress was well aware, from its extensive studies, of the possibility that merchants could use such devices to evade the disclosure requirements of the Act. The Committee hearings are replete with suggestions that such manipulation would render the Act a futile gesture in the case of goods normally sold by installment contract.

*Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 366–67, 93 S. Ct. 1652, 1659, 36 L. Ed. 2d 318 (1973) Because Congress was acutely aware that "some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish," Congress elected to word the act broadly and "entrust its construction to an agency with the necessary experience and resources to monitor its operation." *Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 365, 93 S. Ct. 1652, 1658, 36 L. Ed. 2d 318 (1973). This agency was originally the Federal Reserve Bank. The Dodd Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §5511, transferred this regulatory authority to the Consumer Finance Protection Bureau (hereinafter "CFPB"). Thus, as of July 21, 2011, the CFPB is the agency that promulgates regulations under TILA and publishes the accompanying "official interpretations" of the TILA.

A.  **The TILA Definition of Finance Charges Generally Includes Any Discount For The Purpose of Inducing Payment By Cash**

The TILA defines a "finance charge" as:

the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction.

15 U.S.C. § 1605(a). The regulations provide more explanation regarding what is – and what is not – a finance charge. Specifically, 12 C.F.R. § 226.4, entitled simply, "Finance Charge," provides, in pertinent part:

> (b)    Examples of finance charges. The finance charge includes the following types of charges, except for charges specifically excluded by paragraphs (c) through (e) of this section:
>
> > (9)    Discounts for the purpose of inducing payment by a means other than the use of credit.

The official staff interpretation further explains this principle:

> *Discounts for payment by other than credit.* The discounts to induce payment by other than credit mentioned in § 226.4(b)(9) include, for example, the following situation: The seller of land offers individual tracts for $10,000 each. If the purchaser pays cash, the price is $9,000, but if the purchaser finances the tract with the seller the price is $10,000. The $1,000 difference is a finance charge for those who buy the tracts on credit.

12 C.F.R. Pt. 226, Supp. 1 § 226.4-4(b)(9)(1). Thus, the general rule is that a discount offered to customers that pay in cash but withheld from customers paying with a particular form of credit is considered a finance charge to those customers paying with the particular form of credit.

## B.    A Discount from the Regular Price Is Unquestionably a Finance Charge if Paid by Credit Card

The Cash Discount Act of 1981 amended the Truth in Lending Act. Its provisions are codified at 15 U.S.C.A § 1666f and state, in pertinent part:

**(b)    Finance charge**

With respect to any sales transaction, any discount from the regular price offered by the seller for the purpose of inducing payment by cash, checks, or other means not involving the use of an open-end credit plan or a credit card shall not constitute a finance charge as determined under section 1605 of this title if such discount is offered to all prospective buyers and its availability is disclosed clearly and conspicuously.

15 U.S.C.A. § 1666f (West).    Consequently, as of the date of passage of this act, a retailer was – and remains today – free to offer a consumer a discount from the regular price if the consumer pays by means other than a credit card; if so, that discount is not considered a finance charge.

This change in the law which is also reflected in the regulations.    In light of the Cash Discount Act, 12 C.F.R. § 226.4(c)(8) now provides that "Discounts offered to induce payment for a purchase by cash, check, or other means, as provided in section 167(b) [15 U.S.C.A § 1666f ]  of the Act" are not finance charges.

Nevertheless, to fall within the exception created by the Cash Discount Act – and to escape treatment as a finance charge – the discount cannot be offered to those who pay by credit card.  If the discounted price is paid by credit card, then such discount forfeits the special dispensation granted to it by the Cash Discount Act of 1981 and is – in fact – a finance charge.

C.    **If the <u>Regular Price</u> of an Item is Increased for Card Purchasers, The Difference in Price is a Finance Charge**

There is another scenario in which a cash discount is legally determined by

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

the TILA to be a finance charge. While a discount for cash payment from the regular price may not be classified as a finance charge, if the regular price is grossed up to capture the costs of financing, such increase is considered a surcharge, and therefore is a finance charge under the TILA. The TILA defines a surcharge as "any means of increasing the regular price to a cardholder which is not imposed upon customers paying by cash, check, or similar means." 15 U.S.C.A. § 1602 (West).

## V. FACTS

### A.    The Wells Fargo Program

Named Plaintiffs herein were owners and operators of a chain of jewelry stores. While the Wells Fargo program that Named Plaintiffs participated in was called the "Jewelry Advantage Program," on information and belief this program was identical in all material respects to programs offered by Defendants to retailers of numerous types of merchandise and services to consumers, including – among other items – furniture, home repair, tires, appliances, and electronics. Defendants have various names for these diverse programs, which include Wells Fargo Automotive Advantage, Wells Fargo Health Advantage, Wells Fargo Home Furnishings, and Wells Fargo Home Projects.

Defendants actively promoted to the Named Plaintiffs and Class Members – and to retail customers – a financing scheme to finance the sale of services and merchandise. The scheme was advertised at, promoted at and sold through

Plaintiffs' and the Class Members' brick and mortar retail establishments and the Named Plaintiffs' and the Class Members' websites to potential retail customers. During all relevant times herein, Defendants' financing scheme is advertised and marketed by use of such terms as "no interest", "interest free", "same as cash", "zero interest" and "0% APR" or "no interest if paid in full within [xx] months." The Wells Fargo Program allowed participating retailers to offer several different prices and financing programs for a single item, including "no interest" financing for 12, 24, 48 or 60 months. Based on the length of time financed, Defendants' discount rate charged to the merchant is adjusted to reflect the time price differential. The discounts can vary depending on the length of time the customer is financing. This discount can amount to as much as 22.5% for the 60 month program.

Because the Class Members simply turned the customer over to Defendants following the customer's agreement to make the purchase, the customer became Defendants' customers and cardholder and signed contracts with and made payments to Defendants.

At all times relevant herein, Named Plaintiffs and all Class Members were parties to a Wells Fargo Dealer Agreement (hereinafter, the "Agreement"). While the Agreement has been modified in minor ways over the years, the portions of the agreement relevant to this action have remained in place. The current incarnation

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

of the Dealer Agreement is attached as Exhibit 1. Among other provisions, the Dealer Agreement states, in pertinent part, as follows:

2.  IDENTIFICATION OF PARTIES.
You agree to begin utilizing this Program upon receipt of the necessary supplies and Instructions and Procedures, ***as determined by us in our sole discretion***, on how to:
(a)    process credit applications;
(b)    obtain credit authorizations on Invoices; and
(c)    present Invoices to us for payment.

4.  DEFINITIONS.
(g)  "Credit Card Agreement" is defined as a written agreement between us and the Cardholder containing terms and conditions that govern the Account. ***Any changes to the Credit Card Agreement will be solely made by Wells Fargo.***

(h)  "Consumer Credit Card Account Application" is defined as an application for an Account for financing under the Program, in either written or electronic format, which may include but not be limited to any documents relating to a Consumer Credit Card Account Application that we may require you to print through the IPS (as defined in subparagraph 7(a)(ii) of this Agreement), that upon completion of and presentment to us represents such consumer customer's desire to open an Account and their consent to undergo financial review. ***Such Consumer Credit Card Account Application includes all documents containing the terms, conditions, and disclosures governing such applications as provided for by Law, and is owned and governed by us. Any changes to the Consumer Credit Card Account Application will be solely made by Wells Fargo.***

(j)  "Initial Disclosures" are defined as a disclosure or set of disclosures that you will provide each Cardholder at the opening of an Account ***in a manner and method determined by us in accordance with our Instructions and Procedures. Such Initial Disclosures must include, without limitation, the Truth in Lending disclosures and any other disclosures as determined by us in accordance with all applicable Law.***

(k) "Instructions and Procedures" is defined as ***any instructions or procedures that we communicate to you*** and update from time to time.

(o) "Program" is defined as the Card program that is contemplated by this Agreement ***for the purpose of arranging financing of your consumer customers' purchases***.

(q) "Wells Fargo Confidential Information" is defined as: (A) Cardholder Account Information governed by subparagraph 5(a); and (B) ***Wells Fargo's Confidential Information it provides to you, including without limitation, information about its systems, business practices, and any other information regarding it or its practices as governed by subparagraph 5(b) of this Agreement.***

5. INFORMATION SECURITY.
  (b) ***You agree to treat all other information*** (whether written or oral) which is furnished (whether before or after the date hereof) by us or our directors, officers, employees, affiliates or representatives to you or your representatives and all analyses, compilations, forecasts, studies or other documents or information prepared by us or on our behalf, ***in connection with this Agreement including, but not limited to, discount rates and any other pricing information*** as well as processes and passwords for any Internet sites or other technology, ***confidentially, and not to disclose any information to any:***
  ***(i)   third party,*** except as may be provided for in subparagraph 6(i) below; or

6. PROGRAM REQUIREMENTS.
  (b) DOCUMENTATION, EXAMINATIONS AND AUDITS.
    (iii) POLICIES AND PROCEDURES. ***You agree that we may periodically examine, solely for our purposes only, those policies, procedures, internal controls, and training materials of yours relating to your offering this Program to your consumer customers to ensure compliance with our Instructions and Procedures and with the provisions of all Laws as described in subparagraph 9(b)(ii) below with respect to (without limitation) advertising, marketing, sourcing of consumers, sales practices, and the controls in place to ensure the security of your information systems.***

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

(c)    USE OF PROGRAM AND COMPLIANCE. Wells Fargo is committed to meeting or exceeding all regulatory requirements that are applicable to our Program. You play an integral role in helping us ensure our compliance with all regulatory requirements due to your interactions with the consumer. In connection with your role, you acknowledge and agree that:

(i)    you are responsible for complying with the provisions of all Laws as described in subparagraph 9(b)(ii) below or otherwise may be set forth in this Agreement;

(ii)   *you are responsible for complying with all requirements of this Agreement and the Instructions and Procedures for the Program that we communicate to you and update from time to time*;

(iii)  you will collaborate with us on all training required by us in connection with the Program, to be completed in the time frame indicated by us, and designate the necessary and appropriate employees of yours at the appropriate level and departments within your business (e.g. office manager, finance manager, marketing/advertising manager) to attend all required training related to their role and responsibilities in connection with the Program. Such employees will be responsible for disseminating the requirements of such training to all employees within your business who may be involved with the subject matter of the training, such as employees who accept any Consumer Credit Card Account Application, Invoice or transaction that may be processed under our Program*, so that your employees will be equipped to accurately and completely follow all of the requirements for providing financing under the Program*. If such employees leave your employment or change roles within your business, you will promptly notify us within ten (10) days of the employee's departure and designate a replacement employee or employees to assume this role for your business and ensure that person or those persons complete all required training; and . . .

(v)    *in the event you create and maintain independent and ongoing educational programs designed to educate and train your employees on the requirements for offering financing to your consumer customers and with the purpose of educating your employees about the laws that affect your business, your industry and address the offering of financing, then such training programs will be reviewed and approved by us and such approval will be for our benefit only and may not be relied upon*

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

*for any purpose. Additionally, you agree that in the event we determine, in our sole discretion, that your independent training program does not meet our requirements, you agree to work with us, in good faith, to address any deficiencies and update any such training programs.*

(e)   APPROVAL OF ADVERTISING AND OTHER ASPECTS OF PROGRAM.

    (i)   ***We reserve the right, in our sole discretion to approve or disapprove all aspects of this Program including, but not limited to, advertising, promotional material, credit terms and credit features, and including any changes to the Program***, whether in hard copy, on television, on the radio, on the internet or in any other electronic form. Such approval is for our benefit only, you may not rely on such approval for any purpose. You will give us a minimum of ten (10) business days to review any such requests for approval.

7. PROGRAM PROCESSES (CONSUMER CREDIT CARD ACCOUNT APPLICATIONS AND INVOICES).

  (a) PROCESSING CONSUMER CREDIT CARD ACCOUNT APPLICATIONS AND TRANSACTIONS.

    (i)   ***In connection with your processing of Consumer Credit Card Account Applications, Invoices, Credit Memos and authorizations, you acknowledge and agree you will: (A) follow all terms of this Agreement and our Instructions and Procedures in connection with any processing method made available to you pursuant to this subparagraph 7(a),***

  (c)   TRANSACTIONS AND PROCEDURES.

    (vii)  DOWN PAYMENTS. ***If less than the full amount of any transaction is covered by an Invoice, you will obtain payment in full by cash, check, or major credit card for the remaining balance due at the time the transaction is consummated. We will not finance down payments or deposits on an Account.***

8. PAYMENTS UNDER THE PROGRAM.

  (b) PAYMENT BY YOU. ***You agree to pay us the discount rates and Administrative Fees as set forth in writing by us from time to time (a "Price Sheet").*** . . .

9. REPRESENTATIONS AND WARRANTIES.

    (b) As to all transactions involving your consumer customers, you represent and warrant to us the following:

        (ii) ***that you have complied with the provisions of all Laws, including but not limited to Laws governing your profession and your business practices, all Consumer Protection Laws including the Fair Credit Reporting Act, all applicable fair lending laws and regulations, the Federal Truth in Lending Act, the Federal Equal Credit Opportunity Act, as amended, the federal Unfair, Deceptive, or Abusive Acts and Practices regulations, all state law counterparts of them, and all applicable regulations promulgated under any of them, including, without limitation, any provisions requiring adverse action notification to any individual;***

        (iv) that with respect to all advertising and marketing of Products, financing, or both, you, your employees, your subcontractors, your assigns, and/or your agents have, in all respects, complied with:

           (A) this Agreement,

           (B) standards that we may communicate to you at our option and for our sole benefit from time to time, and

           (C) all applicable Laws, including but not limited to, all Laws governing your business, advertising, home improvement and door-to-door sales, (if applicable), and adherence to all related licensing, registration, documentation disclosure requirements, and any other such requirements as set forth by Law;

        (xi) that you have not increased the purchase price of any Product or added any additional fee for financing to the Cardholder to any Invoice;

        (xii) that you have not taken any adverse action against an applicant or consumer customer because the applicant or consumer customer is a member of a protected class, as defined by applicable Law, or because the applicant or consumer customer has chosen to use credit to finance the purchase, nor have you engaged in any practice that has an impermissible negative impact on members of such protected class or consumer customer that has chosen to use credit to finance the purchase;

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

11. USE OF MARKS.

(a)     For the sole purpose of (1) identifying you as a participant in the Program; (2) administering and operating the Program; and (3) promoting the Program and Wells Fargo's related products and services to Cardholders, ***you hereby grant Wells Fargo a nonexclusive right and license to use, reproduce, and publicly display any and all trademarks, trade names, logos, symbols, and designs appurtenant to your business***, (the "Licensed Trademarks"), including the right to sublicense to third party vendors for the purposes of creating any and all materials for the execution and administration of this Program, subject to all specified requirements of you with respect to the proper use of the Licensed Trademarks. Wells Fargo agrees not to alter, change, or otherwise modify such Licensed Trademarks in any manner, or use them in combination with any other words or symbols without your prior approval. The license granted hereunder is binding upon and inures to the benefit of the grantor's successors and assigns.

(d)  Right to Use Wells Fargo Materials. During the term of this Agreement, Wells Fargo hereby grants to you a non-exclusive, nontransferable, right to use materials created or provided by Wells Fargo to you, for use in connection with the Program and any other materials that are copyrighted or capable of being copyrighted by Wells Fargo ("Wells Fargo Provided Materials"), subject to the terms and conditions of this Agreement, including the following.

(i)   ***Dealer may not modify, change, alter, delete from, or add to Wells Fargo Provided Materials, including but not limited, to any change in text, graphics, color, size, or position***;

(ii)  Dealer will not use or disclose the Wells Fargo Provided Materials, in whole or in part, for the purpose of offering a product that competes with Wells Fargo;

(iii) Dealer will use the Wells Fargo Provided Materials in the manner specified by Wells Fargo or as otherwise agreed to by the parties in writing;

(iv) ***Wells Fargo retains all right, title and interest in and to the Wells Fargo Provided Materials. The Wells Fargo Provided Materials are the sole property of Wells Fargo and any and all uses by you of the Wells Fargo Provided Materials will inure to the benefit of Wells Fargo.*** Any rights to the Wells Fargo Provided Materials are limited to the express terms of the license in this paragraph 11;

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

12. OTHER PROVISIONS.

   (l) ACCOUNT ADMINISTRATION. ***You acknowledge and agree that we have sole authority to prescribe the terms and conditions of the Credit Card Agreement, the terms of the Account, and the credit standards and criteria of current and prospective Cardholders and that we may change our credit standards at any time in our sole discretion without notice to you***.

   (m) TITLE OF PROGRAM. ***Neither you nor any parent, subsidiary, or affiliate of yours will by virtue of this Agreement, secure any title to or other ownership interest in any elements of the Program. You acknowledge and agree that the Program is our exclusive property and that all of the elements of the Program, including Cardholder lists, our Instructions and Procedures, written specifications, training materials, programs, systems and screens, and all documentation and materials relating thereto, constitute trade secrets, which are our exclusive property.*** You agree to use the elements of the credit program and information about the credit program only for the purpose of enabling you to use the credit program provided under this Agreement and for no other purpose.

Wells Fargo Dealer Agreement (emphasis supplied).

As is clear from the foregoing language – as well as the balance of the Dealer Agreement – Defendants exercised a great deal of control over what their participating retailers could say to customers regarding both the program and the interest rate. In fact, the Agreement prohibited participating retailers from disclosing any program fees or discount rates to any third party.

**B.    Wells Fargo Encouraged and Expected Participating Retailers to Gross Up Their Retail Prices to Cover the "Cost" of the Wells Fargo Financing and Participating Retailers Did So**

Wells Fargo supplied participating retailers with a one page document entitled: "Managing the Costs of Financing." (Exhibit 2). In the introductory paragraph of this document, Wells Fargo states: "If your business wants to account

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

for the cost of financing (i.e., discount fee, transaction fee, program fees, etc.), the cost must be included in your product's overall price versus being included as a fee charged to customers using our Card to finance their purchase." This document went on to explain how to properly price retail items:

Scenario: ABC Furniture sells furniture for an entire home. They offer special terms financing to all of their customers, along with cash and credit as a form of payment. They do not charge customers an additional fee to finance but want to cover their cost in the overall profit margin. Below are examples of the correct and incorrect way to include the special terms financing fee on an invoice.



In the correct example above, the merchant has built the cost of financing into the price of the products and then discounted the overall price for his customer paying with cash.

## C.    A Typical Purchase and Finance Transaction Illustrates How Wells Fargo Hid the Finance Charge, Improperly Imposed Sales Taxes on the Hidden Finance Charge, and Improperly Retained these Tax Monies

A typical jewelry purchase illustrates how Wells Fargo's scheme was perpetrated. The customer would be presented with two options. The "First Option" would be to pay the "regular price" of $3,000 for a diamond ring if the customer elected to sign up for the Defendants' financing through the Jewelry Advantage program. This financing was described as a 0% APR with equal payments with a 60 month term. In other words, as long as the customer made their

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

payments each month and paid the entire balance by the end of 60 months, there would be – according to Defendants – no interest.  Unbeknownst to the customer, was the fact that in order to offer a customer this financing option, Defendants exacted a heavy price: Plaintiff J. Edwards Diamonds was required to forfeit 22.5% of the total cost of the retail item in exchange for financing the 60-month "0% interest" transaction.

If the customer chose the first option, the customer would be charged not only the retail price of $3,000, but also the applicable sales tax required by the local taxing authority. This amount is added to underlying price of the merchandise or service, and this total amount is financed.  Assuming for purposes of this example that the sales tax amount was 8%, the customer was charged $3,240.  Defendants thus collect the retail price of the item – which includes the undisclosed 22.5% ($675) – plus the total amount of the sales tax.   The sales tax was calculated on a sales price that includes the 22.5% hidden finance charge.  Defendants would then pay the retailer 77.5% of the total amount paid by the customer (in this example, $2,511), and retain 22.5% (in this example, $729) as the "program fee."    The retailer was then obligated to remit to the local taxing authority the entire $240 in sales tax, despite having recovered only $186 of this amount in taxes from Defendants.  (In fact, because finance charges are exempt from sales taxes, the sales tax should have been assessed only on the actual price of the item ($2,325), rather than the entire $3,000.)  The retailer, by virtue of its participation in this program,

was shortchanged by Defendants to the tune of $54 on this one transaction.  It is this amount that Named Plaintiffs and the Class Members seek to recover from Defendants.

The "Second Option" for the customer would be to pay cash for the ring, at the "discounted" amount of $2,325.00.   Thus, the customer could "save" $675 by paying in cash rather than signing up for Defendants' credit card.  The retailer was willing to offer the cash discount to the customer because if the customer paid cash then the retailer would not have to pay Defendants $675 in fees that Defendants assessed to the retailer as part of its financing program – and of course the retailer would not lose the additional $54 in sales tax monies improperly retained by the Defendants.

Thus, the amount of the discount is typically built in the price of the item, separately imposed on the customer, and paid directly to Defendants by the customer.  The merchant receives no part of the hidden finance charge.  In the foregoing example, the customer actually pays not 0% APR for financing, but $675 in undisclosed pre-calculated, hidden finance charges – which amounts to a whopping 29%.

Because a portion of the amount financed by the consumer is improperly characterized by Defendants as the retail purchase price rather than what it really is – a hidden finance charge – sales tax is improperly charged to the consumer on the hidden finance charge. Unwitting participating retailers remit the entire tax –

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA  92626
TEL 714-839-3800 • FAX 714-795-2995

including the tax on the undisclosed finance charge – to their local taxing authorities. As a consequence, the portion of that sales tax applicable to the hidden finance charge is retained by Defendants and not paid to Named Plaintiffs and Class Members. Thus, Named Plaintiffs and Class Members – who have paid the total sales tax assessed on the transaction to their local taxing authorities – are out this money.

**D. Defendants Were and Are Fully Aware That Their Participating Retailers Were Routinely Accepting Credit Card Payments for the Cash Price**

**1. Defendants Specifically Approved the Format, Verbiage and Functionality Of Named Plaintiffs' Retail Website, Which Clearly Provided Customers The Ability To Pay The Cash Discount Price Via Credit Card**

Pursuant to Paragraph 6(e)(i) of the Dealer Agreement, any credit card offerings on Named Plaintiffs' or participating retailers' retail websites required approval by Defendants' compliance department. When Named Plaintiffs set up their website, Defendants' employee Dixie McConnell, a "Business Liaison Consultant" at Wells Fargo, took charge of site development and worked directly with Named Plaintiffs' programmers in order to create the format and verbiage. Critically, since customers could not pay using cash when buying online, a credit card was the only method of payment that could be used if a customer did not want to finance the purchase via the Defendants' "0%" credit card.

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

As is clear from the below screenshot, Named Plaintiffs website offered – with Defendants' full knowledge, approval and participation -- the ability to finance for 60 months at 0% APR or receive a discounted price and pay that discounted price via a non-Program credit card instead of financing:



This screen shot, along with an additional five screenshots that are attached to this Complaint as Exhibit 3, scotch any claim that Defendants were unaware of – or did not approve of, encourage and facilitate – its participating merchants' practice of accepting credit cards for the "cash price." As a result, the representation of 0% interest rate was a clear TILA violation.

### 2. Receipts Forwarded to Defendants Provided Details of the Transactions

Further evidence of Defendants' knowledge and acquiescence is provided by transaction-level documentary evidence. It is and was common practice for Defendants to fail to approve enough credit for the customer to make the purchase. The customer, for example, would desire to purchase an item for $8,000. However, Defendants would only approve $5,000 worth of credit through its program. As a result, the customer would pay the difference – in this example the $3,000 difference – with either a credit card issued by a different bank or a Wells Fargo card the customer had previously set up with Wells Fargo (collectively referred to herein as a "Non-Program Credit Card"). In instances such as these, Named Plaintiffs – and, on information and belief, Class Members also – discounted the remaining $3,000 to the cash equivalent and allowed the customer pay that amount with the Non-Program Credit Card. As a requirement of the program, copies of receipts detailing these transactions were forwarded to Defendants. These receipts clearly showed that the amount paid by Non-Program Credit Card had been

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

discounted.   A sampling of these receipts is attached as Exhibit 4.[1]   Thus,

Defendants were fully aware that retailers were routinely allowing customers to pay

the discounted cash price with a credit card, and that the representation of 0%

interest was improper and illegal.

> **3.**   **Correspondence from the Named Plaintiffs Also Put Defendants on Notice that Its Participating Retailers Were Routinely Accepting Credit Card Payments for the Cash Price and Misrepresenting its Product as "0% Interest"**

In 2008, the Albuquerque office of the New Mexico Attorney General began

investigating the sales practices of J. Edwards Diamonds.  On October 11, 2012,

Lori Chavez, at the time an Assistant Attorney General at the New Mexico

Attorney General's office sent an email to Stevan Looney, counsel for J. Edwards

Diamonds, in which she stated:

> We have been reviewing the state of the law as it concerns the offering of discounts by merchants to the public based upon the form of payment.  The two primary sources relied upon to determine the state of the law has remained the same:  Truth in Lending Act, 15 USC sec 166f(b) which defines when a discount off a seller's regular price does not constitute a finance charge, and the Electronic Fund Transfer Act, 15 USC sec 1693o-2 which prohibits payment card networks from restricting any person from offering discount incentives to use cash, checks, debit cards or credit cards.  Neither

---

[1]  The first page of Exhibit 4 is a typical transaction utilizing both Wells Fargo and Non-Program Credit Cards as payment after receiving a discounted price. As is revealed by the sales tags taped to the receipt, the 1.00 carat diamond had a retail sticker price of $14,024 and was discounted to $10,097.  The ring had a retail sticker price of $14,660 and was discounted to $11,288.  The customer was given an additional "promo" discount of $1,069.26.  The subtotal is $20,315.74, plus tax of $1,676.05.  Total is $21,991.79.  Customer was approved by Defendants for $17,600, and then had to pay the balance of the total with two Discover cards.  Because a payment plan must be submitted along with invoices, Defendants would have seen the plan was for 60 months 0% interest, and the customer was given discounts, and the customer paid by their open end credit plan and by credit card.

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA  92626
TEL 714-839-3800 • FAX 714-795-2995

statute is directly on point since the TILA regulates creditors, which we agree does not include J. Edwards, and the EFT regulates payment card networks involving electronic fund transfers, which we also agree does not apply to J. Edwards.

Pursuant to 15-USC sec 1666f(b), any discount from the regular price offered by the seller for purposes of inducing payment by cash, check or other means not involving open-end credit plans or credit cards does not constitute a finance charge. We agree that cash discounts include debit card transactions. . . .

We maintain our position that the application of discounts, previously utilized by J. Edwards, constitutes a hidden finance charge.

This email is attached as Exhibit 5.   On May 21, 2017 Named Plaintiff John Silverman forwarded this email to the Defendants in the present action.

On January 24, 2017 Named Plaintiff John Silverman sent a letter to James Strother, Executive Vice President and General Counsel of Wells Fargo in which he stated:

WF has used our company, and thousands of other retailers, to promote and sell their "interest free" scheme.  WF has a very intimate relationship with each of its retailers and therefore, knew, or should have known, based on the way the programs were being presented by retailers to customers, including the various types of discounts and methods of payment being offered, that TILA laws were being violated.  Our company, and all other retailers, rely on WF's expertise and knowledge of the laws related to consumer financing.  By offering customers increased discounts for choosing shorter financing terms, by offering discounts for cash and allowing customers to pay by credit card, by inflating prices to cover the WF discount amounts which are then separately imposed on financing customers and payable directly to WF, these are all actions that fit TILA definitions of a finance charge. . . .

The WF programs and the various methods of discounting offered by us to our customers were not only approved by WF's local office, but later approved in a letter from Mike Lancaster, WF District Manager.

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

Additionally, when we created our website, WF, through its representative Dixie McConnell, took charge of site development and worked directly with our programmers in order to create the format and verbiage. The offering on the website had to be approved by WF's compliance department. Our site offered the ability to finance for 60 months at 0% APR or receive a discount and pay by credit card instead of financing. Operating in this manner was clearly a violation of TILA. As one of the largest finance companies in the United States, WF knew the laws regarding consumer financing. But rather than providing the proper guidance to our company, and other retailers, WF ignored the possible damages retailers could sustain by violating the laws. Instead, WF willfully encouraged and allowed retailers to continue to violate TILA laws and participate in a deceptive scheme in an effort to create more loan volume and profits for their own business.

John Silverman also forwarded the contents of this letter in an email to the Wells Fargo Board of Directors. This email is attached as Exhibit 6 to this complaint.

A letter dated June 12, 2017 from Counsel for Named Plaintiffs to Warren Buffet, major shareholder in Wells Fargo, with copy to Timothy Sloan, CEO of Wells Fargo & Co. provides further evidence. In that letter, which is attached as Exhibit 7, Counsel states:

Thousands of merchant dealers in the country are using the same method of promotion and sales tactics that J. Edwards was using. Unfortunately, the retailers may not be aware that they are participating in a fraudulent financing scheme. . . . Starting in January, 2017,. Mr. Silverman contacted James Strother, Wells Fargo's general counsel. Mr. Strother forwarded the letter to an attorney in his law department [who] . . . has received all the various statutes and details regarding the laws and TILA violations. It is clear that the Wells Fargo "zero interest" financing program is being fraudulently presented by retail dealers to consumers and it is clear that Wells Fargo is participating in these fraudulent schemes because of their contracts with the dealer merchants, customers and federal law.

As if the foregoing evidence were not proof enough, the correspondence sent to Defendants by Named Plaintiffs establish conclusively that Defendants were well aware of the fatal flaws in their "0%" card program, yet chose to do nothing, thereby further defrauding members of the class and consumers.

### 4. Finally, Wells Fargo Knows that Its Cardholders are Using Credit Cards to Pay the Cash Discount Price for Retail Items at Participating Retailers By Virtue of the Fact that It Processes Over 4% of United States Credit Card Transactions

As mentioned, *supra,* in Section II, Defendants issue nearly one out of every twenty credit cards issued in the United States. Their credit card offerings are not limited to the 0% credit card programs they promote to participating retailers, but include numerous categories of Non-Program Credit Cards marketed through their websites and retail branch locations such as the Wells Fargo Cash Wise Card, the Wells Fargo Visa Signature Card, the Wells Fargo Rewards Card, the Wells Fargo Platinum Card, the Wells Fargo Cash Back College Card, the Wells Fargo Secured Credit Card, the Wells Fargo Propel American Express Card, and co-branded credit cards (the Dillard's department store card and the Sacramento State One-Card, for instance).

By virtue of Defendants' market share and the volume of its credit card transactions, Defendants have a great deal of data from these credit card purchases. Included in this data are details of purchases made – at the cash discount price – by

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

Defendants' customers using Defendants' Non-Program Credit Cards at retailers that have signed Dealer Agreements.

**E.    Wells Fargo's Scheme Is Immensely Profitable to Defendants and Results in Significant Harm to Class Members and Consumers**

On information and belief, Defendants finance approximately $8,000,000,000 ($8 billion) worth of sales under the Program each year. Thus, Defendants collect approximately $800,000,000 ($800 million) in hidden and illegal finance charges plus approximately $64,000,000 ($64 million) in sales tax (based on national sales tax averages) per year. The amount of sales tax on the illegal finance charges paid to the various local taxing authorities in error due to the hidden finance charges over the course of four years is approximately $256,000,000 ($256 million). This is the amount that should be reimbursed to Class Members.

**VI.    FRAUDULENT CONCEALMENT ALLEGATIONS**

Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals in the employ of Defendants responsible for disseminating false and misleading marketing materials regarding financing scheme. Defendants necessarily are in possession of all of this information. Plaintiffs' claims arise out of Defendants' fraudulent concealment of the legal infirmities in its financing scheme. To the extent that Plaintiffs' claims arise from Defendants' fraudulent concealment, there is no one document or communication – and no one interaction – upon which

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

Plaintiffs base their claims.  Plaintiffs alleges that at all relevant times, including specifically at the time they entered into the Dealer Agreement with Defendants, Defendants knew, or were reckless in not knowing, of the violations of the Truth in Lending Act; Defendants were under a duty to disclose violations based upon its exclusive knowledge of the violations, and its concealment of the violations; and Defendants never disclosed the violations to Plaintiffs or the public at any time or place or in any manner.

Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Defendants:

a.    ***Who***: Defendants actively concealed the TILA violations from Plaintiffs and Class Members while simultaneously touting the legality and soundness of the program. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals in Defendants' employ responsible for such decisions.

b.    ***What***: Defendants knew, or were reckless or negligent in not knowing, that its financing scheme was violative of the Truth in Lending Act. Defendants concealed the violations and made representations about the legality and soundness of its financing scheme.

c.    ***When***: Defendants concealed material information regarding the TILA violations at all times and made representations about the legality and

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA  92626
TEL 714-839-3800 • FAX 714-795-2995

soundness of its financing scheme on an ongoing basis, until the present, as alleged above in Section V. And when Plaintiffs confronted with Defendants regarding the problems with their financing program, Defendants denied any knowledge of or responsibility for the TILA violations, and actually blamed Plaintiffs for causing the problem.

d.   ***Where***: Defendants concealed material information regarding the true nature of the financing program in every communication it had with Plaintiffs and Class Members and made representations about the legality and soundness of the financing program. Plaintiffs are aware of no document, communication, or other place or thing, in which Defendants disclosed the truth about the TILA violations to anyone outside of Defendants' employ. Such information is not adequately disclosed in any sales documents, displays, advertisements, or on Defendants' website.

e.   ***How***:  Defendants concealed the TILA violations from Plaintiffs and Class Members and made representations about the legality and soundness of its financing scheme. Defendants actively concealed the truth about the existence and nature of the TILA violations from Plaintiffs and Class Members at all times, even though it knew about the TILA violations and knew that information about the TILA violations would be important to a reasonable consumer.

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA  92626
TEL 714-839-3800 • FAX 714-795-2995

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

f.     **_Why_:** Defendants actively concealed material information about the TILA violations for the purpose of inducing Plaintiffs and Class Members to participate in their financing programs, rather than doing business with Defendants' competitors. Had Defendants disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and Class Members would have been aware of it, and would not have participated in the program.

## VII.  TOLLING OF THE STATUTE OF LIMITATIONS

**Fraudulent Concealment Tolling**

Upon information and belief, Defendants have known of the TILA violations since well before Plaintiffs and Class Members began participating in the program, and has concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the TILA violations.  Any applicable statute of limitation has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein.

**Estoppel**

Defendants were and are under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the financing program. Defendants actively concealed the true character, quality, and nature of the financing program and knowingly made representations about the legality and soundness of the financing program. Plaintiffs and Class Members reasonably

relied on Defendants' knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## VIII.  CLASS ALLEGATIONS

This action is maintained as a class action on behalf of the following described class:

> All persons who reside within the United States and who entered into a Dealer Agreement with any of the Defendants as part of the following programs: Wells Fargo Jewelry Advantage, Wells Fargo Automotive Advantage, Wells Fargo Health Advantage, Wells Fargo Home Furnishings, Wells Fargo Home Projects.

> Excluded from the Class are all employees, including, but not limited to, Judges, clerks and court staff and personnel, of the United States District Court, their spouses, and any minor children living in their households.  Also excluded are employees of Wells Fargo, N.A. and Wells Fargo Financial National Bank, their spouses, and any minor children living in their households.  Also excluded are Class counsel and their employees, their spouses, and any minor children living in their households

The unlawful actions of Defendants entitle Named Plaintiffs and Class members to restitution, actual damages and injunctive relief.

The members of the Class for whose benefit this action is brought are so numerous that joinder of all Class Members is impracticable. The exact number of members of the Class are unknown to Named Plaintiffs.  However, members of the Class are reasonably believed to number in excess of 5,000.  The identity of

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

individuals qualifying for Class Membership is readily ascertainable via inspection of documents maintained by Defendants.

Named Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and capable in class action litigation and in the field of consumer law.   Named Plaintiffs understand and appreciate their duties to the Class under FED. R. CIV. P. RULE 23 and are committed to vigorously protecting the rights of absent members of the Class.

Named Plaintiffs are asserting claims that are typical of the claims of each member of the Class they seek to represent, in that Defendants' actions with respect to the Named Plaintiffs was identical to Defendants' action with respect to the members of the Class that Named Plaintiffs seek to represent.  All claims alleged on behalf of the Class flow from this conduct.  Moreover, each member of the Class suffered similar harm as a consequence of Defendants' conduct. Finally, there is no conflict between Named Plaintiffs and the members of the Class with respect to this action.

There is a well-defined community of interest in the questions of law and fact affecting the parties to be represented. Questions of law and fact arising out of Defendants' conduct are common to all members of the Class, and such common issues of law and fact predominate over any questions affecting only individual members of the Class. Issues of law and fact common to members of the class include, but are not limited to, the following:

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA, 92626
TEL 714-839-3800 • FAX 714-795-2995

a.     Whether each of the Defendants is a "creditor" as that term is defined by the Truth in Lending Act;

b.     Whether Defendants, by instructing plaintiffs to increase their prices to include Defendants' charges for financing, creates a hidden finance charge;

c.     Whether Defendants' collection of sales tax on the finance charge is improper or illegal;

d.     Whether Defendants are liable for restitution and/or damages and the amount of such restitution and/or damages; and

e.     Whether as a result of Defendants' misconduct, Named Plaintiffs and the Class are entitled to equitable and declaratory relief, and, if so, the nature of that relief.

The relief sought by members of the class is common to the entirety of the class.

Defendants have acted on grounds generally applicable to each member of the Class, thereby making formal declaratory relief or corresponding injunctive relief appropriate with respect to the Class as a whole.

This action is also properly maintained as a class action in that the prosecution of separate actions by individual members of the class would create a risk of adjudication with respect to individual members which would establish incompatible standards of conduct for Defendants.

This action is properly maintained as a class action in that the prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members which would, as a practical

matter, be dispositive of the interests of the other members not parties to the adjudication, or would substantially impair or impede their ability to protect their interests.

A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein given that, among other things:

a.  significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigating the common issues on a class-wide instead of a repetitive individual basis;

b.  the size of the individual damages claims of most members of the Class is too small to make individual litigation an economically viable alternative, such that few members of any of the Class have any interest in individually controlling the prosecution of a separate action;

c.  without the representation provided by Plaintiff herein, few, if any, members of the Class will receive legal representation or redress for their injuries;

d.  class treatment is required for optimal deterrence;

e.  despite the relatively small size of the claims of many individual members of the Class, their aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost effective basis, especially when compared with repetitive individual litigation;

f.  no unusual difficulties are likely to be encountered in the management of this class action;

g.  absent a class action, Defendants' illegal conduct will go unremedied and uncorrected; and

h.  absent a class action, the members of the Class will not receive compensation, and will continue to be subjected to Defendant's illegal conduct.

Concentrating this litigation in one forum would aid judicial economy and efficiency, promote parity among the claims of the individual members of each of the Class, and result in judicial consistency.

## IX.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Asserted on Behalf of Named Plaintiffs and the Class**
**Violations of California's Unfair Competition Law Cal. Bus. &**
**Prof. Code §§ 17200,** *et seq***.**

Named Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated herein.

California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.,* protects both consumers and competitors by promoting fair competition in commercial markets for goods and services. California's Unfair Competition Law is interpreted broadly and provides a cause of action for any unlawful, unfair, or fraudulent business act or practice. Any unlawful, unfair, or fraudulent business practice that causes injury falls within the ambit of California's Unfair Competition Law.

Defendants engage in substantial sales and marketing of their financial products and services within the State of California.

Because of Defendants' unlawful and unfair business practices, Named Plaintiffs and members of the Class were unfairly, and unlawfully misled into promoting Defendants' illegal financing scheme, and into paying unnecessary sales

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

taxes.   Named Plaintiffs relied, to their detriment, on Defendants' false representations, detailed above, regarding the costs, benefits, and policies governing Defendants' products.  The Class was uniformly exposed to Defendants' unlawful and unfair business practices.

Additionally, as detailed above, Defendants also engaged in unfair, unlawful and/or fraudulent acts or practices by promoting its financing schemes.

Pursuant to the California Supreme Court's decision in *McGill v. Citibank, N.A.,* 2 Cal. 5th 945, 216 Cal.Rptr.3d 627, 393 P.3d 85 (2017), Plaintiffs specifically request as a remedy under the UCL that this Court issue a public injunction requiring Defendant to immediately cease operation of its current financing programs.

## SECOND CAUSE OF ACTION
**Asserted on Behalf of Named Plaintiffs and the Class**
**Violations of the Truth in Lending Act**

Named Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated herein.

As detailed, *supra* in Section IV, the Truth in Lending Act prohibits the imposition of hidden finance charges.   The disclosure statement issued in conjunction with this consumer credit transactions violated the requirements of Truth in Lending and Regulation Z in the following and other respects:

(a)   By failing to include in the finance charge certain charges imposed by Defendants payable by consumers incident to the extension of credit as

required by 15 U.S.C. § 1605 and Regulation Z § 226.4, thus improperly disclosing the finance charge in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z § 226.18(d).

(b)     By improperly including certain charges in the amount financed which are finance charges, Defendants improperly disclosed the amount financed by consumers in violation of 15 U.S.C. § 1638(a)(2) and Regulation Z § 226.18(b).

(c)     By calculating the annual percentage rate (APR) based upon improperly calculated and disclosed finance charges and amount financed, 15 U.S.C. § 1606, Regulation Z § 226.22, Defendants understated the disclosed annual percentage rate in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 226.18(c).

By reason of the aforesaid violations of the Act and Regulation Z, Defendants are liable to Named Plaintiffs and Class Members in the amount of actual damages to be established at trial, and attorneys fees and costs in accordance with 15 U.S.C. § 1640.

## THIRD CAUSE OF ACTION
### Asserted on Behalf of Named Plaintiffs and the Class
### Unjust Enrichment

Named Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

As a result of Defendants' unlawful and deceptive actions described above, Defendants were enriched at the expense of Named Plaintiffs and the Class through collection and retention of improper sales tax on items sold through the Class Members, which Defendants unlawfully and/or deceptively reaped from customers.

Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Named Plaintiffs and the Class, in light of the fact that Wells Fargo used illegal, deceptive, and/or unfair practices to induce Class Members to enter into the Dealer Agreements. Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to the Plaintiffs and the Class for the monies retained by Defendants as a result of the unfair, deceptive, and/or illegal practices.

## X. REQUEST FOR RELIEF

Named Plaintiffs, individually and on behalf of all others similarly situated, request judgment against Defendants as follows:

A.    For an order certifying the Class and, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), appointing Named Plaintiffs as representative of the Class and appointing the lawyers and law firms representing Named Plaintiffs as counsel for the Class;

B.    Declaring Defendants' actions to be false, misleading, and/or deceptive;

FORTIS LLP
650 TOWN CENTER DRIVE , SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

C.    Permanently enjoining Defendants from performing further unfair and unlawful acts as alleged herein;

D.    For all recoverable compensatory, statutory, and other damages sustained by Named Plaintiffs and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

E.    Granting Named Plaintiffs and the Class awards of restitution and/or disgorgement of Wells Fargo's profits from its unfair and unlawful practices described above;

F.    For costs;

G.    For both pre-judgment and post-judgment interest on any amounts awarded;

H.    For appropriate injunctive relief, including a public injunction as articulated by the California Supreme Court in *McGill v. Citibank, N.A.,* 2 Cal. 5th 945, 216 Cal.Rptr.3d 627, 393 P.3d 85 (2017).

I.    For treble damages insofar as they are allowed by applicable laws;

J.    For appropriate individual relief as request above;

K.    For payment of attorneys' fees and expert fees as may be allowable under applicable law; and

L.    For such other and further relief, including declaratory relief, as the Court may deem proper.

/ / /

## XI.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Matthew A. Berliner*
Matthew A. Berliner
California State Bar No. 224384
**FORTIS LLP**
650 Town Center Drive
Suite 1530
Costa Mesa, CA 92626
714.418.5840 office
714.795.2995 fax
mberliner@fortislaw.com

Scot Wilson
California State Bar No. 223367
**ROBINSON CALGANIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
949.720.1288
949.720.1292 – Facsimile
swilson@robinsonfirm.com

Walt D. Roper
Texas State Bar No. 00786208
**THE ROPER FIRM, P.C.**
3131 McKinney Avenue
Suite 600
Dallas, TX 75204
214.420.4520
1+214.856.8480 – Facsimile
walt@roperfirm.com

***(application of pro hac vice admission will be filed within ten days)***

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Robert A. Skipworth
Texas State Bar No. 18473000
**ROBERT A. SKIPWORTH, ATTORNEY AT LAW**
310 N. Mesa, Suite 600
El Paso, TX  79901
915.533.0096
915.544.5348 – Facsimile
rskipworth@aol.com

*(application of pro hac vice admission will be filed within ten days)*

**ATTORNEYS FOR PLAINTIFFS**

FORTIS LLP
650 TOWN CENTER DRIVE, SUITE 1530
COSTA MESA, CALIFORNIA 92626
TEL 714-839-3800 • FAX 714-795-2995

COMPLAINT